UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DEBRA J. WILHELM,                          )
                                           )
        Plaintiff,                         )
                                           )
    v.                                     )    CIVIL NO.  1:17cv22
                                           )
NANCY A. BERRYHILL, Acting                 )
Commissioner of Social Security,           )
                                           )
        Defendant.                         )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for disability

insurance benefits (DIB) as provided for in the Social Security Act.  42 U.S.C. §423(d).  Section

205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based.  The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of no less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant last met the insured status requirements of the Social Security Act

on December 31, 2010.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 15, 2006 through her date last insured of December 31, 2010 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the severe impairments of osteoarthritis of the knees and obesity (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant was limited to lifting, carrying, pushing and pulling ten pounds frequently and ten pounds occasionally.  The claimant could sit at least six hours in an eight-hour workday and stand and/or walk two hours in an eight-hour workday.  The claimant should not climb ropes, ladders or scaffolds.  The claimant could occasionally kneel, crouch, and crawl. The claimant could balance on even terrain but might have difficulties with balance when walking, standing, crouching upon very narrow, slippery or erratically moving surfaces and so should avoid such surfaces.  The claimant could occasionally bend and stoop in addition to what is required to sit.  The claimant could occasionally use ramps and stairs one or two flights with rails. The claimant should not perform work within close proximity to open/exposed heights and open/dangerous machinery such as open flames and fast moving exposed blades.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on November 23, 1965, and was 45 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404. Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 15, 2006, the alleged onset date, through December 31, 2010, the date last insured (20 CFR 404.1520(g)).

(Tr. 596-607).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on August 14, 2017. On September 19, 2017, the defendant filed a memorandum in support of the Commissioner's decision. Plaintiff has declined to file a reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Both parties have submitted medical summaries, which the court incorporates as follows.

In 1999, Plaintiff underwent left knee surgery. In May 2006, Plaintiff reported pain in her left

knee, which was attributed to a meniscus tear (Tr. 367, 385). Imaging revealed mild osteoarthritis

(Tr. 368). Plaintiff underwent a successful arthroscopy and meniscectomy repair (Tr. 387). Some

weeks later, Plaintiff complained of pain in her right knee, and she was given a knee brace and

pain medication (Tr. 365–66). Several years later, in November 2009, Plaintiff presented to her

primary care physician, Dr. Dana Forrest, M.D., complaining of left knee pain that she had been

"dealing with for a long time" (Tr. 317). Dr. Forrest noted that Plaintiff likely had "advancing

osteoarthritis" in her left knee, and the doctor administered a steroid injection (Tr. 317).

Plaintiff continued to see Dr. Forrest for other complaints for the remainder of 2009 and

much of 2010, but Dr. Forrest's notes from that time period do not include references to knee

pain (Tr. 318–23). It was not until April 2011—after her date last insured—that Plaintiff returned

with complaints of worsening knee pain (Tr. 325). At that point, she requested and received

steroid injections in both knees (Tr. 325–26). She received additional injections in her right knee

in January and March of 2012 (Tr. 377, 380), and she reported limitations in walking and moving

around (Tr. 377). X-ray scans in January 2012 revealed moderate-to-severe osteoarthritis in

Plaintiff's right knee (Tr. 384, 405). She was advised to wear a brace, take anti-inflammatory

medication, and lose weight, all of which were, in her orthopaedist's words, measures to

"hopefully buy time until she may need a knee replacement some day" (Tr. 379). Plaintiff had her

right knee replaced in May 2012 (Tr. 469) and her left knee replaced in July 2012 (Tr. 452).

Plaintiff also reported pain in her back (Tr. 194, 235, 249, 318, 349) and her right hip (Tr. 249, 349) during and after the period at issue. A chest x-ray taken on January 21, 2008, showed mild thoracic dextroscoliosis, an abnormal curvature to the right in the mid-back. She also had mild degenerative changes in the thoracic spine. X-ray scans of her spine in December 2009 revealed some joint space narrowing but were negative for gross osteopathy (Tr. 249). Around the same time, Plaintiff reported improvement in her back pain (Tr. 318). In 2015, well after her date last insured, Plaintiff underwent a lumbar fusion (Tr. 1309, 1333) and received injections in her cervical spine (Tr. 1308–09).

In 2016, Plaintiff again complained of pain in her right hip (Tr. 1221), but imaging was unremarkable (Tr. 903).

Plaintiff complained of neck pain in 2007 (Tr. 206, 351), but a CT scan was essentially normal (Tr. 209). It was noted that her neck pain might have been secondary to sinusitis or musculoskeletal issues (Tr. 207). On January 27, 2011, Plaintiff presented to the emergency room with neck pain, complaining of pain with flexion and extension of the neck and with lateral movement of the head in either direction. An emergency room physician diagnosed her with acute torticollis.

Plaintiff underwent surgery to remove her gallbladder in March 2007 (Tr. 211). There were no complications. Plaintiff complained of sinus headaches in December 2007 (Tr. 280). She was advised that reflux might be contributing to her symptoms, that she should cut back on food that made her reflux worse, and that she should try treating her sinus condition with a nasal spray (Tr. 281). She continued to complain of headaches in 2008, though the connection to her sinuses

was eventually ruled out (Tr. 282). With treatment of hypertension, her headaches resolved (Tr. 286).

In late 2008, Dr. Forrest treated Plaintiff's sinus problems with nasal spray and antihistamines (Tr. 295). Notes from mid-2009, reflect similar complaints and similar treatment (Tr. 302). In April 2009, at Plaintiff's request (Tr. 303), Dr. Forrest wrote a letter stating that the dry heat in her apartment could be a factor in her frequent upper respiratory infections (Tr. 306). Plaintiff continued to experience "sinus issues" in 2010, and Dr. Forrest continued to treat the condition with nasal sprays and antihistamines (Tr. 319).

In April 2011—after her date last insured—x-ray scans of Plaintiff's left shoulder revealed degenerative changes in her right AC joint (Tr. 262). Physical examination from around that time revealed no abnormalities in Plaintiff's extremities (Tr. 257, 260, 274). In February 2016—many years after her date last insured—Plaintiff underwent a right shoulder arthroplasty (Tr. 859).

Plaintiff is morbidly obese. Her height is 5'1" and her weight has fluctuated from 241 pounds to 274 pounds (*see, e.g.* Tr. 198, 323).

On January 21, 2008, Plaintiff's primary care physician recorded a blood pressure reading of 164/90, diagnosed hypertension, and placed Plaintiff on Benicar HCT. Her blood pressure stabilized with medication, which was changed to Lisinopril HCTZ in 2009. Plaintiff has also been diagnosed with dyslipidemia and hyperlipidemia. Plaintiff was prescribed Pravastatin.

State agency consultants who reviewed the medical evidence of record in August and October of 2011 opined that there was insufficient evidence to establish severe impairments prior to Plaintiff's date last insured (Tr. 345, 348).

With respect to mental functioning, beginning in April 2008, treatment notes from Dr. Forrest reflect complaints of anxiety (Tr. 290, 294). Dr. Forrest recommended therapy, but Plaintiff declined (Tr. 290). In September 2008, Plaintiff renewed her complaints of anxiety, and Dr. Forrest prescribed Celexa (Tr. 294–95). When Plaintiff returned in October 2008, she reported feeling "much better" on the medication, though she also reported some anxiety attacks, prompting Dr. Forrest to prescribe another medication, Klonopin, to be taken as needed (Tr. 296–97). Some months later, in March 2009, Plaintiff went to the emergency room reporting an anxiety attack (Tr. 239). By the time she was seen by a doctor, her symptoms improved "dramatically" (Tr. 239). In late 2009, Plaintiff reported increased anxiety related to an attack on her daughter (Tr. 317). In August 2011—after Plaintiff's date last insured—a State agency psychological consultant reviewed the evidence of record and opined that, even considering Dr. Forrest's treatment notes, there was insufficient evidence to establish a severe mental impairment (Tr. 331–43). That opinion was affirmed by a different State agency consultant in September 2011 (Tr. 347).

In January 2012, Plaintiff reported that her anxiety was well-controlled by taking Xanax as needed (Tr. 426). Later in 2012, Plaintiff twice presented to the emergency room with anxiety-related issues (Tr. 393, 400). At one such visit, Plaintiff reported she was out of medication and, upon taking medication, "her anxiety was resolved" (Tr. 393). At a follow-up visit to Dr. Forrest in 2012, Plaintiff again indicated that she was not interested in therapy (Tr. 424).

In support of remand or reversal, Plaintiff first argues that the ALJ erred in not incorporating limitations from chronic sinusitis and anxiety impairments into the residual

functional capacity analysis, and in not considering the combined impact of the limitations from all impairments.

It is well established that the determinative issue in disability adjudication is the functional impact of a condition; a mere diagnosis or examination note does not establish the severity of an impairment. *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (the issue "is not the existence of these various conditions . . . but their severity and, concretely, whether . . . they have caused her such severe pain that she cannot work full time"); *Johnson v. Colvin*, No. 2:13-CV-138-PRC, 2014 WL 4722529, at *4 (N.D. Ind. Sept. 22, 2014) ("The mere diagnosis of an impairment does not establish that the impairment affects the individual's ability to perform basic work activities.") (citations omitted). Accordingly, "an impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a). And RFC, in turn, is the most an individual can do despite the actual limitations caused by her physical and mental impairments. 20 C.F.R. § 404.1545(a).

Plaintiff bears the burden of providing evidence establishing both that she has an impairment that is severe under the regulations and the degree to which her impairments limit her RFC. *See* 20 C.F.R. §§ 404.1512(a), 1545(a)(3); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), as amended (Dec. 13, 2000).

Although Plaintiff cites notes in the record reflecting her complaints of and treatment for a sinus condition and anxiety, she fails to identify any record evidence establishing that these conditions actually imposed functional limitations. It is not enough to simply infer that the conditions must have imposed limitations. Clearly, doing so would be entirely improper. *See* 20

C.F.R. § 404.1520b ("After we review all of the evidence relevant to your claim . . . , we make findings about what the evidence shows."); *Carradine*, 360 F.3d at 754 (the issue "is not the existence of these various conditions . . . but their severity and, concretely, whether . . . they have caused her such severe pain that she cannot work full time").

In the present case, the ALJ's written decision contains an exhaustive discussion of the lengthy medical record, which included, as the ALJ recognized, numerous distinct medical conditions (*see* Tr. 597–604). In discussing the evidence, the ALJ noted a reference to sinusitis in one medical record (Tr. 598 (citing Tr. 207)), but he did not discuss the condition in more detail. However, Plaintiff has not demonstrated that there was evidence establishing that her sinus infections, which she treated over the course of the period at issue with a combination of over-the-counter and prescription medications, significantly limited her ability to do basic work activities. Thus, she has clearly failed to demonstrate that the condition was a severe impairment or that it required any specific limitations in the RFC. *See* 20 C.F.R. §§ 404.1521(a) 404.1545(a). It is well established that the ALJ "need not provide a 'complete written evaluation of every piece of testimony and evidence.'" *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (*quoting Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). Considering the lack of evidence of any significant limitations, the ALJ's failure to discuss at length the passing references to sinusitis was not error.

With respect to anxiety, the ALJ's discussion was much more detailed, though the conclusion was the same: there was no severe impairment (Tr. 599–601). The ALJ explicitly discussed the evidence relating to Plaintiff's complaints of anxiety by applying the "special technique" for evaluating mental impairments that is set out in the Commissioner's regulations

(Tr. 599–601); *see* 20 C.F.R. § 404.1520a(c) (explaining that the Commissioner will rate the degree of functional limitation in the domains of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). Considering the evidence of record, the ALJ found that Plaintiff had no more than mild limitations in the functional domains of activities of daily living, social functioning, and concentration, persistence or pace, and that she had no episodes of decompensation (Tr. 600). Not surprisingly, the ALJ found that Plaintiff's anxiety was not a severe impairment (Tr. 600); *see* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."). The ALJ further explained that, while the record reflected Plaintiff's complaints of stress and anxiety, the record did not reflect frequent treatment for the condition and Plaintiff herself testified that her anxiety medication was effective and did not cause any side effects (Tr. 601 (*see* Tr. 41, 645)).

Although Plaintiff asserts that she had "stress levels above which she could not succeed", she does not specifically explain why—or even directly assert that—the ALJ's findings were unsupported. Plaintiff has bluntly ignored the fact that the record does not contain an opinion from any examining or treating physician indicating that she was disabled or contradicting the ALJ's RFC finding (Tr. 604). Rather, Plaintiff asks this Court to infer limitations and substitute its judgment for that of the ALJ. Clearly, this Court is not permitted to do so. *See* Powers, 207 F.3d at 434–35. As it is clear that the ALJ did not err in his RFC analysis, there is no basis for remand on this point.

Next, Plaintiff contends that the ALJ improperly evaluated obesity. The ALJ found

Plaintiff's obesity to be a severe impairment, specifically noting Plaintiff's weight and body mass

index during the period at issue (Tr. 597). Additionally, the ALJ specifically considered whether

Plaintiff's obesity caused, affected, or exacerbated her other conditions (Tr. 597, 604). The ALJ

noted that while obesity did not appear to cause or exacerbate any respiratory or cardiovascular

issues, it likely did affect her knee pain (Tr. 597, 604). The ALJ specifically noted that he had

considered Plaintiff's obesity in the RFC assessment (Tr. 597); *see* Social Security Ruling (SSR)

02–1p, 2002 WL 34686281, at *6 (Sept. 12, 2002). As SSR 02-1p explains, obesity may or may

not increase the severity of functional limitations of other impairments. *See* SSR 02-1p, 2002 WL

34686281, at *6. In the present case, the ALJ specifically explained that Plaintiff's obesity

exacerbated her knee pain, which was related to osteoarthritis that worsened during the period at

issue (Tr. 604). In light of the combined effects of her progressive osteoarthritis and her obesity,

the ALJ explained, Plaintiff was limited to a sedentary RFC (Tr. 604). As the ALJ explained,

there was no opinion from a treating or examining physician that would indicate Plaintiff was

further limited (Tr. 604).

Thus, this court holds that the ALJ properly considered the evidence related to Plaintiff's

obesity and properly explained his finding that the combined effects of Plaintiff's osteoarthritis

and obesity imposed some limitations during the period at issue (Tr. 604). Remand is not

warranted on this point.

Plaintiff's final contention relates to the ALJ's reliance on the vocational expert's

testimony at the July 2016 hearing as to the number of jobs available in the national economy

that Plaintiff could perform. However, as the Commissioner points out, the vocational expert

explained his methodology and, in any event, the ALJ provided an alternative basis for his step-five finding. Plaintiff has not even challenged the ALJ's alternative basis.

At step five of the sequential evaluation process, an ALJ must determine whether a claimant, despite her work-related limitations, can perform work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). In making this determination, an ALJ may rely on the expertise of a vocational expert. 20 C.F.R. § 404.1566(e). In this case, the ALJ provided two alternative bases for his step-five finding that there were jobs existing in significant numbers that Plaintiff could perform given her age, education, work history, and RFC (Tr. 605–07).

First, the ALJ based his finding on the vocational expert's testimony in response to a hypothetical question that accurately set out Plaintiff's functional limitations as supported by the evidence (Tr. 606–07, 640–41). The vocational expert identified a number of representative occupations existing in significant numbers in the national economy that an individual with such limitations could perform (Tr. 641–42). Specifically, the vocational expert testified that there were 8,000 "sorter" jobs, 10,000 "assembler" jobs, 5,000 "final assembler" jobs, 4,000 "table worker" jobs, 8,000 "circuit board assembler" jobs, and 125,000 "hand packager" jobs in the national economy that an individual with Plaintiff's limitations could perform (Tr. 641–42). In response to questioning from Plaintiff's representative, the vocational expert explained that he reached those numbers by relying on his experience, federally published information, and the "SkillTRAN Job Browser Pro" application (Tr. 646).

Clearly, the vocational expert's testimony provided substantial evidentiary support for the ALJ's step five finding that jobs existed in significant numbers in the national economy that

Plaintiff could perform (Tr. 606–07, 641–42); *see, e.g., Sims v. Barnhart*, 309 F.3d 424, 432 (7th

Cir. 2002) (ALJ did not err in relying on the VE's testimony at step five "because [the

hypothetical question] reflected [the claimant's] impairments to the extent that the ALJ found

them supported by the evidence in the record"); *Liskowitz v. Astrue*, 559 F.3d 736, 745–46 (7th

Cir. 2009)("Where, as here, the VE identifies a significant number of jobs the claimant is capable

of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the

ALJ to rely on the VE's testimony").

Plaintiff does not challenge the hypothetical question the ALJ posed to the

vocational expert; rather she argues that the vocational expert did not properly explain the

methodology used to arrive at the job numbers he provided. As noted in other cases, this Court is

aware of Seventh Circuit *dicta* concerning the methods vocational experts use to calculate the

number of jobs available in the national economy. In *Blankenship v. Colvin*, this Court noted that

there is no legal requirement that the ALJ, or the vocational expert, explain the methodology

used by SkillTRAN. *See* No. 1:16-CV-222, 2017 WL 2805883, at *4 (N.D. Ind. June 29, 2017),

appeal docketed, No. 17-2772 (7th Cir. Aug. 29, 2017). In *Blankenship*, this Court held that it

was sufficient that the vocational expert provided the source of his numbers, namely SkillTRAN,

which is publicly available labor market software. *Id.* (citing *Lesner v. Colvin*, No. 12 C 7201,

2015 WL 5081267, at *8 (N.D. Ill. Aug. 24, 2015)). Similarly, in *Chavez v. Berryhill*, this Court

did not disturb the ALJ's step-five finding, based on the vocational expert's "equal-distribution

method" of calculating job numbers, explaining that the Seventh Circuit has not held that the

method is reversible error. No. 1:16-CV-314, 2017 WL 3124432, at *5 (N.D. Ind. July 24, 2017)

("Had the Seventh Circuit intended the equal distribution method to be ruled impermissible, it

would have said so."). Here, as in prior cases, the vocational expert explained how he reached his job numbers, and the ALJ properly accepted that methodology as reasonable.

Importantly, Plaintiff does not argue that her limitations actually reduced the number of available jobs to below a significant level. As noted, the vocational expert identified many thousands of jobs (Tr. 641–42), well exceeding the minimum threshold for significance. *See Liskowitz*, 559 F.3d at 743 (citation omitted) ("As few as 174 jobs has been held to be significant, and it appears to be well-established that 1,000 jobs is a significant number."). There is no reasonable basis for remand on this point as there is no reason to believe that remand would lead to a different result. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Additionally, the ALJ provided an alternative basis for his step-five finding. Thus, even without the vocational expert's testimony, a finding of "not disabled" was appropriate under the Commissioner's Medical–Vocational Guidelines (also known as "the grids") (Tr. 606); 20 C.F.R. pt. 404, subpt. P. app. 2. Plaintiff has not challenged—or acknowledged—that finding. Moreover, Plaintiff has not submitted a reply brief countering any of the Commissioner's arguments.

As the Seventh Circuit has explained, "[w]hen a person has only exertional limitations, or when her non-exertional limitations are insignificant, the grids are dispositive on the issue of disability, and an ALJ may rely on the grids to determine whether a person is disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), as amended (Aug. 20, 2014)(citation omitted)*; see also Bailey v. Astrue*, No. 2:11-CV-124, 2012 WL 3916283, at \*11 (N.D. Ind. Sept. 7, 2012) (affirming where ALJ found that claimant had nonexertional limitations that had little or no effect

on the occupational base of unskilled sedentary work and claimant did not challenge the ALJ's application of the grids). This is because the grid rules "take administrative notice that there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy." SSR 96-9p, 1996 WL 374185, at *3 (S.S.A. 1996). Thus, where the full range of sedentary work is not significantly eroded, application of the grid rules themselves provides the substantial evidentiary support for an ALJ's step-five finding.

In the present case, the ALJ explained that the grids provided an alternative foundation in support of his step-five finding (Tr. 606). The ALJ explained that while Plaintiff had some nonexertional limitations, they did not sufficiently erode the unskilled sedentary occupational base to preclude reliance on the grids. Plaintiff has not challenged that finding. As the ALJ noted, the Commissioner's rulings address the effects of the non-exertional limitations involved in the instant case (Tr. 606) (citing SSR 83-10, 1983 WL 31251 at *5 (S.S.A. 1983) ("By its very nature, work performed primarily in a seated position entails no significant stooping."); SSR 85-15, 1985 WL 56857, at *7 (S.S.A. 1985) (explaining that a limitation to occasional stooping or crouching would leave the sedentary and light occupational bases "virtually intact" and that crawling and kneeling is "relatively rare" in jobs at any exertional level and limitations in those abilities "would be of little significance in the broad world of work"); and SSR 96-9p, 1996 WL 374185, at * 7–9 (S.S.A. 1996) ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work. . . . If an individual is limited in balancing only on narrow, slippery, or erratically moving surfaces, this would not, by itself,

result in a significant erosion of the unskilled sedentary occupational base. . . . Even a need to avoid all exposure to [hazards] would not, by itself, result in a significant erosion of the occupational base.").

As noted, if the sedentary occupational base is not significantly eroded, the grids may be relied on at step five because the rules take administrative notice of the significant numbers of unskilled sedentary jobs in the national economy. SSR 96-9p, 1996 WL 374185, at *3; *see Murphy*, 759 F.3d at 819. Thus, Plaintiff's final argument fails and the ALJ's decision must be affirmed.

<u>Conclusion</u>

On the basis of the foregoing, the ALJ's decision is hereby AFFIRMED.

Entered: November 13, 2017.

s/ William C. Lee
William C. Lee, Judge
United States District Court